

2005 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

7-14-2005

# SBC Comm Inc v. FCC

Precedential or Non-Precedential: Precedential

Docket No. 03-4311

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2005

Recommended Citation

"SBC Comm Inc v. FCC" (2005). *2005 Decisions.* Paper 770.
http://digitalcommons.law.villanova.edu/thirdcircuit_2005/770

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2005 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No: 03-4311

SBC INC.,
                    Petitioner

v.

FEDERAL COMMUNICATIONS COMMISSION;
UNITED STATES OF AMERICA,
                    Respondents

Petition for Review of an Order of the
Federal Communications Commission

Argued: November 16, 2004

Before: McKEE and CHERTOFF,[*] *Circuit Judges*,
and BUCKWALTER, *Senior District Judge*[**]

---

[*]Judge Chertoff heard oral argument in this case but resigned before the opinion was filed. The opinion is filed by a quorum of the panel. 28 U.S.C. §§ 46(d).

[**]The Hon. Ronald L. Buckwalter, Senior District Judge of the United States District Court for the Eastern District of

(Opinion filed: July 14, 2005)

JAMES D. ELLIS, ESQ.
PAUL K. MANCINI, ESQ.
SBC Communications, Inc.
175 East Houston Street
San Antonio, Texas 78205

GARY L. PHILLIPS, ESQ.
JAMES P. LAMOUREUX, ESQ.
SBC Communications, Inc.
1401 I Street, N.W., 4th Floor
Washington, D.C.  20005

MICHAEL K. KELLOGG, ESQ.
COLIN S. STRETCH, ESQ.  (Argued)
Kellogg, Huber, Hansen, Todd & Evans, P.L.L.C.
1615 M Street, N.W. Suite 400
Washington, D.C. 20036
*Attorneys for Petitioner*

R. HEWITT PATE, ESQ.
Assistant Attorney General
MAKAM DELRAHIM, ESQ.
Deputy Assistant Attorney General
ROBERT B. NICHOLSON, ESQ.
ROBERT B. WIGGERS, ESQ.
Attorneys

---

Pennsylvania, sitting by designation.

2

United States Department of Justice
Washington, D.C. 20530

JOHN A. ROGOVIN, ESQ.
General Counsel
RICHARD K. WELCH, ESQ.
DANIEL M. ARMSTRONG, ESQ. (Argued)
Associate General Counsel
JOHN E. INGLE, ESQ.
Deputy Associate General Counsel
RODGER D. CITRON, ESQ.
Counsel
Federal Communications Commission
Washington, D.C. 20554
*Attorneys for Respondent*

OPINION

McKEE, *Circuit Judge*.

SBC Communications, Inc., petitions for review of an order of the Federal Communications Commission captioned, "*Cost-Based Terminating Compensation for CMRS Providers*, 18 FCC Rcd 18441, released on September 3, 2003 (the "*Order Under Review*"). SBC contends that the *Order Under Review* violated the Administrative Procedure Act by improperly revising an FCC rule without first affording notice and an opportunity for comment as required by the APA. SBC also argues that the *Order Under Review* cannot be upheld because it is arbitrary and capricious. For the reasons explained below,

3

we will deny the petition for review.

## I. GENERAL BACKGROUND

The technological sea change that has occurred in the telecommunications industry has revolutionized the manner in which local telephone service is provided. It has also resulted in dramatic changes in federal and state regulations of the industry. Prior to the passage of the Telecommunications Act of 1996 (the "1996 Act"), Pub. L. 104-104, 110 Stat. 56, "[s]tates typically granted an exclusive franchise in each local service area to a local exchange carrier ("LEC")." *AT&T Corp. v. Iowa Utilities Board*, 525 U.S. 366, 371 (1999). The LEC typically owned, "among other things, the local loops (wires connecting telephones to switches), the switches (equipment directing calls to their destinations), and the transport trunks (wires carrying calls between switches) that constitute a local exchange network."[1] *Id.* The 1996 Act restructured local telephone markets by preempting state and local franchise

---

[1] The jargon used in the telecommunications industry can be confusing because everyday words are used in a highly technical manner. For example, although the instant dispute involves the "switches" used in telecommunications, those switches bear no resemblance to the single pole, single throw, toggle switch that most of us use to turn lights on and off in our homes. Rather, these "switches" are computers that direct the flow of telephone traffic by controlling the electric circuits that conduct the electro magnetic energy that telephone calls consist of. *See Indiana Bell v. McCarty*, 362 F.3d 378 (7th Cir. 2004).

arrangements, 47 U.S.C. § 253, and by requiring "incumbent local exchange carriers (ILECs) to share their networks and services with competitors seeking entry into the local service market." *MCI Telecommunication Corp. v. Bell Atlantic-Pennsylvania*, 271 F.3d 491, 498 (3d Cir. 2001).

> Congress recognized that without allowing new entrants to use the incumbents' local exchange networks and other technology and services, the incumbents would maintain a stranglehold on local telephone service: no new entrant could realistically afford to build from the ground up the massive communications grid the incumbents had developed through years of monopolistic advantage.

*Indiana Bell v. McCarty*, 362 F.3d 378, 382 (7th Cir., 2004) (footnote omitted).

Among other things, the 1996 Act required that ILECs allow competitors to "interconnect" to their networks. *See* 47 U.S.C. § 251(c)(2). Interconnection is critically important to a competitive local exchange market. Without it, customers of one carrier – e.g., the ILEC, that has historically served that area – would not be able to call customers of another carrier – e.g., a competitive LEC ("CLEC"), that has recently initiated service in that same area.

When local carriers establish interconnection arrangements, the 1996 Act requires them to include compensation terms, known as "reciprocal compensation

5

arrangements," for delivery of the traffic they exchange. 47 U.S.C. § 251(b)(5). When a customer of carrier A makes a local call to a customer of carrier B, and carrier B uses its facilities to connect, or "terminate," that call to its own customer, the "originating" carrier A is ordinarily required to compensate the "terminating" carrier B for the use of carrier B's facilities. *See Global NAPS, Inc. v. FCC*, 247 F.3d 252, 254 (D.C. Cir. 2001) (Reciprocal compensation arrangement "means that when a customer of Carrier X calls a customer of Carrier Y who is within the same local calling area, Carrier X pays Carrier Y for completing or 'terminating' the call."). With respect to the compensation a carrier may recover for the transport and termination of traffic that originates with another carrier, the 1996 Act requires just and reasonable rates that provide for "the mutual and reciprocal recovery by each carrier of costs associated with the transport and termination on each carrier's network facilities of calls that originate on the network facilities of the other carrier." 47 U.S.C. § 252(d)(2)(A)(I). The 1996 Act effectively defines a reasonable rate as one that is "a reasonable approximation of the additional cost of terminating such calls," and prohibits any regulatory proceeding to establish such costs "with particularity." 47 U.S.C. §§ 252(d)(2)(A)(ii), 252(d)(2)(B)(ii).

The 1996 Act directs competing LECs to address "reciprocal compensation" terms in the first instance through voluntary negotiations. *See* 47 U.S.C. §§ 251(b)(5), 252(a); *MCI Telecommunications*, 271 F.3d at 500. When they are unable to do so, the 1996 Act permits either party to petition the appropriate state utilities commission to arbitrate the dispute in accordance with the terms of the 1996 Act and the FCC's

6

implementing regulations. *See* 47 U.S.C. § 252(b)(1). The 1996 Act also required the FCC to adopt regulations to implement the Act, including its reciprocal compensation provisions. *See generally Iowa Utilities Board*, 525 U.S. at 377-78, 384. Within six months of the adoption of the 1996 Act, the FCC issued a comprehensive rulemaking decision to satisfy that requirement. *See* First Report and Order, *Implementation of the Local Competition Provisions in the Telecommunications Act of 1996*, 11 FCC Rcd 15499 (1996) (the "*Local Competition Order*").[2]

In the *Local Competition Order*, the FCC established a presumption that the reciprocal compensation rates that two interconnecting carriers may charge each other are symmetrical.

---

[2]Many parties petitioned for review of numerous aspects of the *Local Competition Order*. Those petitions were consolidated in the Eighth Circuit. The Order's subsequent history is as follows: *Modified on recon.*, 11 FCC Rcd 13042 (1996), *vacated in part, Iowa Utils. Bd. v. FCC*, 120 F.3d 753 (8th Cir. 1997), *aff'd in part, rev'd in part*, *AT&T Corp. v. Iowa Utils. Bd.*, 525 U.S. 366 (1999), *decision on remand, Iowa Utils. Bd. v. FCC*, 219 F.3d 744 (8th Cir. 2000), *aff'd in part, rev'd in part*, *Verizon Communications Inc. v. FCC*, 535 U.S. 467 (2002). However, no party petitioned for review of the FCC's rule for determining the availability of the tandem interconnection rate for interconnecting carriers. That rule is the subject of this petition for review, and will be explained in more detail below.

7

Accordingly, the ILECs' rates generally serve as the proxy for other telecommunications carriers' additional costs of transport and termination. *Local Competition Order*, 11 FCC Rcd at 16031-44 (¶¶ 1069-1093); *see also* 47 C.F.R. § 51.71(a) (symmetrical reciprocal compensation rules). The FCC adopted symmetric rates because, among other things, they are easy to administer, can prevent ILECs' from taking advantage of their "unequal bargaining position," and do not discourage carriers' incentives to reduce costs. 11 FCC rcd at 16040-41 (¶¶ 1086, 1087, 1088); *see also Id.* at 16040 (¶ 1086). The FCC explained that it adopted the ILECs' rates as a proxy for the rates of other carriers because "[b]oth the incumbent LEC and the interconnecting carriers will be providing service in the same geographic area, so the[ir] forward-looking economic costs should be similar in most areas." *Local Competition Order*, 11 FCC Rcd at 16040 (para. 1085). This ratemaking scheme thus allows carriers to recover, through reciprocal compensation, "a reasonable approximation" of their costs. *See* 47 U.S.C. § 252(d)(2)(A)(ii).

The older, established telephone networks that traditionally have been built by ILECs utilize a hub-and-spoke design. The outside of the network – the ends of the spoke – are switches,[3] known as "end-office" switches, that directly serve customers in a particular local calling area. These end-office switches may be connected directly, one to another. In

---

[3] As noted above, a switch is a computer that directs the path of a telephone call by opening and closing the electrical pathway (or circuit) over which the call travels. *Supra* at n. 1.

addition (or alternatively), the end-office switches are connected to a "tandem" switch – the hub of the wheel. These tandem switches do not directly serve customers, but instead route calls to the appropriate end-office switch (sometimes via another tandem switch) and, therefore, serve a number of local calling areas. *See MCI Telecommunications*, 271 F.3d at 502. When a call goes through the ILEC's tandem switch, the ILEC incurs additional costs because it then has to transport the call from the tandem switch to the end-office switch. *Local Competition Order*, 11 FCC Rcd at 16042 (¶ 1090). *See also Indiana Bell Tel. Co. Inc. v. McCarty*, 362 F.3d at 384. Moreover, interconnecting carriers do not always have identical networks and therefore must sometimes terminate calls over different types of facilities.

The FCC recognized that "[n]ew entrants cannot hope to replicate the incumbents' network switch for switch" and would instead deploy "new technology" to terminate calls on their network. *Local Competition Order*, 11 FCC Rcd at 16042 (¶ 1090). Nevertheless, the FCC's *Local Competition Order* adopted a general regime of symmetrical reciprocal compensation rates and directed the states to establish "presumptive symmetrical rates based on the incumbent LEC's costs for transport and termination of traffic. . . ." 11 FCC Rcd at 16042 (¶ 1089). Given the advantages it perceived from using symmetrical rates, the FCC found that the ILECs' costs "serve as reasonable proxies for other carriers' costs of transportation and termination for the purpose of reciprocal compensation." *Id*. at 16041 (¶ 1088).

The FCC separately addressed the special situation that

occurs when a competing carrier's newer technology does not precisely replicate the traditional "tandem switch" routing typically employed by the ILEC. The FCC offered the following explanation of its resolution of that problem:

> We find that the "additional costs" incurred by a LEC when transporting and terminating a call on a competing carrier's network are likely to vary depending on whether tandem switching is involved. We, therefore, concluded that states may establish transport and termination rates in the arbitration process that vary according to whether the traffic is routed through a tandem switch or directly to the end-office switch. In such event, states shall also consider whether new technologies (e.g., fiber ring or wireless networks) perform functions similar to those performed by an incumbent LEC's tandem switch and thus, whether some or all calls terminating on the new entrant's network should be priced the same as the sum of transport and termination via the incumbent LEC's tandem switch. Where the interconnecting carrier's switch serves a geographic area comparable to that served by the incumbent LEC's tandem switch, the appropriate proxy for the interconnecting carrier's additional costs is the LEC tandem interconnection rate.

11 FCC Rcd at 16042 (¶ 1090).

The FCC thus mandated an inquiry into the geographic

10

area served in determining the appropriate compensation rate in some circumstances that may involve tandem switching even though the state of the competing carrier's technology might not use tandem switching to complete a given call.

The substance of this rule is set forth in the final sentence of ¶ 1090 of the *Local Competition Order.* That text is nearly identical to the text of Rule 51.711 (a)(3). Pursuant to ¶ 1090 and Rule 51.711(a)(3), a non-ILEC carrier is entitled to recover the tandem interconnection rate for terminating traffic on its network upon a showing that its switch serves a geographical area comparable to that served by the ILEC's tandem switch. According to the FCC, there is no need for the non-ILEC to also show that its switch is "functionally equivalent" to the ILEC's tandem switch.

The FCC claims that the initial reciprocal compensation rules inadvertently encouraged some competitive carriers to "game the system" by such practices as soliciting business only from internet service providers ("ISPs"). *See generally WorldCom, Inc. v. FCC*, 288 F.3d 429 (D.C.Cir. 2002), *cert. denied sub nom. Core Communications, Inc v. FCC*, 538 U.S. 1012 (2003). An ISP's dial-up customers call the ISP to connect to the internet and typically remain on the line for an extended period of time. When the ISP subscribes to a CLEC for its local service and the ISP's dial-up customers are local telephone customers of an ILEC, the CLEC's transport and termination services are used to connect the caller to the internet. However, the exaggerated duration of the connected calls meant that the CLEC recorded protracted use for purposes of reciprocal compensation calculations. As the Court of

11

Appeals for the D.C. Circuit recently found, the FCC's initial reciprocal compensation regime was "flaw[ed]" because "ISPs typically generate large volumes of one-way traffic in their direction." *WorldCom, Inc. v. FCC*, 288 F.3d at 431. According to the FCC, some competitive carriers were able to earn substantial parts of their revenues by delivering traffic that originated on the ILEC network to the ISPs on the competitive carriers' own networks. CLECs would therefore receive compensation for completing lengthy calls made by an ILEC's customers yet never have to pay an ILEC for completing traffic in the other direction. This system attracted some competitive LECs "that entered the business simply to serve ISPs, making enough money from reciprocal compensation to pay their ISP customers for the privilege of completing the calls." *Id.*

According to the FCC, this practice by some CLECs was partly responsible for causing some state utility commissioners to try to reduce what they perceived as excessive payments to competitive carriers that were solely in the business of terminating calls to ISPs. *See Intercarrier Compensation Regime*, 16 FCC Rcd at 9649 n.173. In arbitration proceedings before state utility commissions after the *Local Competition Order* became effective, some state commissioners interpreted ¶ 1090 of the *Local Competition Order* as imposing upon a non-ILEC carrier two separate conditions precedent to recovering the tandem interconnection rate. *Id.* Such a carrier would have to establish *both* that its switch served a geographic area comparable to the ILEC's, *and* that its switch functioned in a manner equivalent to the ILEC's tandem switch. *See, e.g.,* Arbitration Award*, Proceeding to Examine Reciprocal Compensation Pursuant to Section 252 of the Federal*

12

*Telecommunications Act of 1996,* Docket No. 21982, 2000 Tex. PUC Lexis 95 (Tex. PUC July 13, 2003) at \*45-47; *see also* Opinion and Order Concerning Reciprocal Compensation*, Proceeding on Motion of the Commissioner to Reexamine Reciprocal Compensation*, N. Y. PUC LEXIS 398 at \*96-97 (N.Y. PSC Aug. 26 1999).

This two prong test resulted in some CLECs receiving the lower non-tandem rate for reciprocal compensation and thus receiving smaller amounts of compensation. According to the FCC, some federal district courts affirmed some of those state commission decisions. FCC's Br. at 11 (citing, e.g., *U. S. West Communications, Inc. v. Public Serv. Comm'n*, 75 F.Supp.2d 1284, 1289 (D.Utah 1999)).

In addition to these specific rules regarding the tandem interconnection rate, the FCC also adopted two more general rules relating to reciprocal compensation rates. First, the FCC adopted a rule that mirrored the "additional costs" language of § 252(d)(2)(A)(ii) requiring that reciprocal compensation rates be "structured consistently with the manner that carriers incur th[e] costs" of terminating local calls. 47 C.F.R. § 51.709(a); *see also id.* § 51.507(a) (requiring rates to be "structured consistently within the manner in which the costs of providing the elements are incurred"). Second, the FCC stressed that reciprocal compensation rates must be crafted consistently with "rate structure rules" that require distinct rates for different functions, including (I) "tandem switching," (2) "local switching," and (iii) the use of "transmission facilities between tandem switches and end offices." *Id.* §§ 51.509, 51.709(a).

13

## II. THE CURRENT DISPUTE.

On February 2, 2000, Sprint PCS wrote a letter to the chiefs of the FCC's Common Carrier Bureau (now known as the "Wireline Competition Bureau") and Wireless Telecommunications Bureau seeking guidance on whether a wireless telephone service provider may "recover in reciprocal compensation all the additional costs it incurs in terminating local traffic originated on other networks." *See* Letter from Jonathan M. Chambers, Sprint PCS, January 26, 2000. The letter was prompted by state commissioner decisions on reciprocal compensation that Sprint PCS claimed were inconsistent with the 1996 Act and the Local Competition Order. *Id.* at 18, 19-20.

The FCC issued a public notice requesting comments on the Sprint letter, and numerous parties responded. *Attwood Letter*, 16 FCC Rcd at 9598. Many of the responses also asked the FCC to clarify the rule governing payment of the tandem interconnection rate for terminating traffic to commercial mobile radio service providers ("CMRS" or "wireless" or "mobile carriers"). *See, e.g.*, Comments of Western Wireless Corporation, June 1, 2000 (App. 48-49); *see also* Reply Comments of US West Communications, Inc., June 13, 2000 (App. 62).

On April 27, 2001, while Sprint's letter request was pending, the FCC released a *Notice of Proposed Rulemaking* ("NPRM"), in which it undertook to reexamine the general subject of intercarrier compensation. *See Intercarrier Compensation NPRM*, 16 FCC Rcd 9610. The NPRM

14

addressed many subjects, including the question of when an interconnecting carrier is entitled to recover the tandem rate for reciprocal compensation.

The FCC acknowledged that there had been some disagreement over the availability of the tandem interconnection rate – specifically, whether a competitive carrier must demonstrate functional equivalency as a separate requirement independent of, and in addition to, comparable geographic area coverage in order to recover the tandem rate. *Intercarrier Compensation NPRM*, 16 FCC Rcd at 9647, 9648 (¶¶ 103, 105). The FCC noted that "in dealing with problems presented by ISP-bound traffic, some states have incorporated a functional equivalency test into their interpretations of section 51.711(a)(3)." *Id.* at 9649 n.173. For example, both "the Texas PUC and the New York PCS concluded that large imbalances in traffic flows strongly suggest that a carrier is serving a higher proportion of convergent customers rather than a large distribution of customers similar to those served by an ILEC tandem switch." *Id.*

The FCC stated that the state commission decisions imposing a separate functional equivalency requirement in addition to the geographic area test were "inconsistent with our rule." *Intercarrier Compensation NPRM*, 16 FCC Rcd at 9649 n.173. The Commission pointed out that Rule 51.711(a)(3) requires only that a carrier demonstrate that its switch serve "a geographic area comparable to that served by the incumbent LEC's tandem switch" in order to receive the tandem rate. *Id.* at 9648 (¶ 105). Nevertheless, the FCC acknowledged the problems addressed in those state decisions and it undertook to

"consider whether to amend the rule to give states greater flexibility in applying a tandem interconnection rate to networks using newer, more efficient technologies." *Id.* at 9649 n.173. It also invited comment, including comment on whether it should amend its rule to include "the 'functional equivalency' concept. . . ." *Id.* at 9649 (¶ 107).[4]

On May 9, 2001, the chiefs of the Common Carrier Bureau and the Wireless Telecommunications Bureau, acting on delegated authority, released the *Attwood Letter* addressing the issues raised in Sprint's letter as well as the responsive comments. 16 FCC Rcd 9597. The *Attwood Letter* was an opinion letter of the FCC staff. Although it primarily addressed Sprint's inquiry regarding wireless carriers' incurring asymmetrical, "additional costs" in terminating telephone traffic, it also addressed "when a carrier is entitled to the tandem interconnection rate." *Id.* at 9599. The *Letter* noted that the FCC had recently confirmed that, "[w]ith respect to when a carrier is entitled to the tandem interconnection rate, . . . section 51.711(a)(3) requires only a geographic area test." *Id.*[5] The opinion *Letter* concluded: "Therefore, a carrier demonstrating that its switch serves a 'geographic area comparable to that served by the incumbent LEC's tandem switch' is entitled to the tandem interconnection rate to terminate local

---

[4] The issues raised in the FCC's NPRM have not yet been resolved.

[5] The FCC had confirmed this in the *Intercarrier Compensation NPRM*.

16

telecommunications traffic on its network." *Id*.

SBC then sought review of the *Attwood Letter* by the full Commission. SBC argued that in eliminating the "functional equivalence" test, the *Attwood Letter* allowed a CLEC that meets the geographic comparability test to charge for both tandem switching and transmission to the end-office switch, even if it did not perform those functions. SBC was concerned that, absent an inquiry into functional equivalence to ensure that the switching in question was tantamount to tandem switching, originating carriers may pay the higher tandem switching rate even though the terminating carrier never had to provide that service to terminate calls on its network.

In applying for review of the *Attwood Letter*, SBC alleged that the FCC staff had engaged in legislative rule-making without complying with the procedural notice and comment requirements of the APA. SBC also argued that the *Attwood Letter* was contrary to the language of the 1996 Act and the Commission's rules and orders. *See* Application for Review of SBC Communications, Inc., June 8, 2001 (App. 65, 74-80).

The Commission denied both claims in the *Order Under Review*. The *Order Under Review* affirmed the reasoning of the FCC staff in the *Attwood Letter*. The full Commission thus concluded that the clarification of the applicable rule – as announced in the *Intercarrier Compensation NPRM* and the *Attwood Letter* – was an interpretive ruling not subject to the notice and comment requirements of the APA. *Order Under Review* at ¶¶ 22-25. The FCC also concluded that the plain

17

language of the relevant statutory provisions governing reciprocal compensation only required satisfaction of the geographic area test. *Id.* at ¶¶ 17-21. Thereafter, SBC filed the instant petition for review.[6]

### III.  STANDARD OF REVIEW

Here, as before the Commission, SBC argues that the

---

[6] We have jurisdiction pursuant to 28 U.S.C. § 2342(1), which provides"

> The court of appeals (other than the United States Court of Appeals for the Federal Circuit) has exclusive jurisdiction to enjoin, set aside, suspend (in whole or in part), or to determine the validity of –
> (1) all final orders of the Federal Communications Commission made reviewable by section 402(a) of title 47;

and 47 U.S.C. § 402(a), which provides:

> Any proceeding to enjoin, set aside, annul, or suspend any order of the Commission under this chapter (except those appealable under subsection (b) of this section) shall be brought as provided by and in the manner prescribed in chapter 158 of Title 28.

FCC's elimination of the functional equivalency test in determining appropriate compensation between carriers violated the APA because it was tantamount to legislative rule-making and therefore subject to the APA's requirement of notice and comment. If we conclude that the agency acted "without observance of procedure as required by law," 5 U.S.C. § 706(2)(D), we must vacate the *Order Under Review* and remand the issues raised in the *Attwood Letter* back to the FCC so that the agency can comply with the notice and comment requirements of the APA. *See Sprint Corp. v. FCC*, 315 F.3d 369, 377 (D.C. Cir. 2003). However, an agency's determination that "its order is interpretative," and therefore not subject to notice and comment requirements, "in itself is entitled to a significant degree of deference." *Viacom International Inc. v. FCC*, 672 F.3d 1034, 1042 (2d Cir. 1982) (citation and internal quotations omitted).

In reviewing the substance of SBC's claim that the *Attwood Letter* is inconsistent with the 1996 Act, we must uphold the *Order Under Review* unless it is "arbitrary, capricious, [an] abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). This is a "deferential standard" that "presume[s] the validity of agency action." *Southwestern Bell Tel. Co. v. FCC*, 168 F.3d 1344, 1352 (D.C.Cir. 1999). The FCC is due substantial deference in its implementation of the Communications Act, and "even greater deference" when interpreting its own rules and regulations." *Capital Network Sys. v. FCC*, 28 F.3d 201, 206 (D.C.Cir. 1994). *Global NAPs, Inc. v. FCC*, 247 F.3d 252, 257-58 (D.C.Cir. 2001).

19

# IV.  DISCUSSION

Given the apparent complexity of the subject matter, and the resulting potential for confusion, it will be helpful to restate the substance of SBC's challenge to the *Order Under Review* and place it in context before discussing the merits of the parties' positions.

To reiterate, when a customer of carrier A makes a local call to a customer of carrier B, carrier B must use its facilities to connect (or "terminate") that call to its customer.  Under the Act, carrier A (the "originating" carrier) is required to compensate carrier B (the "terminating" carrier) for using carrier B's facilities to connect the call to carrier B's customer.

SBC is an ILEC. As we also explained earlier when discussing the hub-and-spoke design that typifies "traditional" telephone networks,  when a call goes through SBC's tandem switch, SBC incurs additional costs because it has to transport the call from the tandem switch to the end-office switch.  More specifically,  SBC must (I) switch the call at the tandem switch, (ii) transport the call to the end-office switch that serves the CLEC's customer, and then (iii) switch the call at the end-office switch and deliver it to that customer.  Under the 1996 Act, SBC can recover the costs of each of those functions from the CLEC. The costs are grouped together into a single rate known as the "tandem interconnection rate," or "tandem rate," and that is the rate that the CLEC must pay SBC for using SBC's network to complete calls to the CLEC's customer.

However, the same is not true when a local customer of

20

SBC calls a CLEC's customer because the CLEC will frequently have the advantage of more efficient and sophisticated technology that was not available when SBC built its network. Accordingly, the CLEC may not duplicate SBC's end-office switch and tandem switch network in terminating traffic. According to SBC, the CLEC's new technology will not involve the three distinct functions to connect an incoming call. SBC claims that the CLEC's compensation for completing the call should therefore reflect the CLEC's reduced costs. SBC submits that the functional equivalency test better captures that actual cost than the geographic area test because the equivalency inquiry allows the greater efficiency of more modern technology to be factored into the equation. According to SBC, the geographic area test ignores any differences between its network and the CLEC's network by only focusing on the area served by competing carriers. As noted above, SBC makes two arguments to support its position, and we consider each claim separately.

## A. The *Order Under Review* Violates the Notice and Comment Requirements of the Administrative Procedure Act.

In the *Attwood Letter*, the FCC's staff stated:
With respect to when a carrier is entitled to the tandem interconnection rate, the Commission stated that section 51.711(a)(3) of its rules requires only that the comparable geographic area test be met before a carrier is entitled to the tandem interconnection rate for local call termination. It noted that although there has been

21

some confusion stemming from additional language in the text of the *Local Competition Order* regarding functional equivalency, section 51.711(a)(3) requires only a geographic area test. Therefore, a carrier demonstrating that its switch serves "a geographic area comparable to that served by the incumbent LEC's tandem switch" is entitled to the tandem interconnection rate to terminate local telecommunications traffic on its network. The *NPRM* does seek comment on whether we should change this rule.

16 FCC Rcd 9597. In affirming that interpretation, the FCC explained:

We find that the [*Attwood Letter*'s] interpretation of our rules is correct. Section 51.711(a)(3) of our rules governs when the tandem rate is applicable, and plainly requires *only* a comparable geographic area test to be met for a carrier to receive the tandem interconnection rate: "Where the switch of a carrier other than an incumbent LEC *serves a geographic area comparable to the area served by the incumbent LEC's tandem switch*, the appropriate rate for the carrier other than an incumbent LEC is the incumbent LEC's tandem interconnection rate."

*Order Under Review*, at 8 (quoting 47 C.F.R. § 51.711(a)(3)) (emphasis in original).

22

SBC claims that the FCC announced the functional equivalency test in its *Local Competition Order*, and that the *Order Under Review* effectuated a substantive change in the law without adhering to the notice and comment requirements of the APA. Therefore, SBC contends the *Order Under Review* is unlawful and must be vacated.

"It is a maxim of administrative law that: 'If a second rule repudiates or is irreconcilable with a prior legislative rule, the second rule must be an amendment of the first rule; and, of course, an amendment to a legislative rule must itself be legislative.'" *National Family Planning and Reproductive Health Ass'n, Inc. v. Sullivan*, 979 F.2d 227, 235 (D.C. Cir. 1992) (citation and internal brackets omitted). "'Legislative' rules that impose new duties upon the regulated party have the force and effect of law and must be promulgated in accordance with the proper procedures under the Administrative Procedure Act." *Chao v. Rothermel*, 327 F.3d 223, 227 (3d Cir. 2003) (citation omitted). The applicable provision of the APA provides, in relevant part:

> (b) General notice of proposed rule making shall be published in the Federal Register, unless persons subject thereto are named and either personally served or otherwise have actual notice thereof in accordance with law. . . .

> (c) After notice required by this section, the agency shall give interested persons an opportunity to participate in the rule making through submission of written data, views, or

23

arguments with or without opportunity for oral presentation.

5 U.S.C. § 553(b), (c).

Legislative rules are subject to the notice and comment requirements of the APA because they "work substantive changes in prior regulations," *Sprint Corp*., 315 F.3d at 374, or "create new law, rights, or duties." *Fertilizer Institute v. EPA*, 935 F.2d 1303, 1307-08 (D.C. Cir. 1991). "'Interpretative' rules, on the other hand, seek only to interpret language already in properly issued regulations." *Chao*, 327 F.3d at 227 (citation omitted). "If the agency is not adding or amending language to the regulation, the rules are interpretative." *Id.* (citation omitted). "Interpretative, or 'procedural,' rules do not themselves shift the rights or interests of the parties, although they may change the way in which the parties present themselves to the agency." *Id*. (citation omitted). "An interpretative rule simply states what the administrative agency thinks the statute means, and only reminds affected parties of existing duties." *Fertilizer Institute*, 935 F.2d at 1307 (citation and internal quotations omitted). "Interpretative or procedural rules and statements of policy are exempted from the notice and comment requirement of the APA." *Chao*, 327 F.3d at 227 (citing 5 U.S.C. § 553(b)(A)).

Thus, one of the questions that must be answered in determining whether an agency rule is legislative or interpretative is "whether the rule effectively amends a prior legislative rule." *American Mining Congress v. Mine Safety & Health Administration*, 995 F.2d 1106, 1112 (D.C. Cir. 1993).

24

Furthermore, if an agency's present interpretation of a regulation is a fundamental modification of a previous interpretation, the modification can only be made in accordance with the notice and comment requirements of the APA. *Paralyzed Veterans of America v. D.C. Arena, L.P.*, 117 F.3d 579, 586 (D.C. Cir. 1997).

SBC insists that the *Order Under Review* eliminated the functional equivalency test, and that it therefore changed the FCC's prior interpretation of a CLEC's entitlement to the tandem rate. Accordingly, argues SBC, it was tantamount to a legislative amendment and subject to the APA's requirement of notice and comment. According to SBC, the legislative amendment results from the focus of the *Order Under Review* on the language of Rule 51.711(a)(3).

As noted, that rule states that a CLEC is entitled to the tandem rate where the CLEC's switch "serves a geographic area comparable to the area served by the incumbent LEC's tandem switch." According to SBC, the *Order Under Review* therefore had the effect of completely eliminating the functional equivalency inquiry mandated by the *Local Competition Order.* SBC claims that worked a substantive change in the FCC's prior pronouncements regarding a CLEC's entitlement to the tandem rate without invoking the notice and comment provisions of the APA. *See Paralyzed Veterans of America,* 117 F.3d at 586 ("Once an agency gives its regulation an interpretation, it can only change that interpretation as it would formally modify the regulation itself: through the process of notice and comment rulemaking.").

25

SBC's claim is not without some force as there is language in the *Local Competition Order* that appears to support SBC's claim. The *Local Competition Order* provides, in relevant part:

> the "additional costs" incurred by a LEC when transporting and terminating a call on a competing carrier's network are likely to vary depending on whether tandem switching is involved. *We, therefore, concluded that states may establish transport and termination rates in the arbitration process that vary according to whether the traffic is routed through a tandem switch or directly to the end-office switch. In such event, states shall also consider whether new technologies (e.g., fiber ring or wireless networks) perform functions similar to those performed by an incumbent LEC's tandem switch and thus, whether some or all calls terminating on the new entrant's network should be priced the same as the sum of transport and termination via the incumbent LEC's tandem switch.* Where the interconnecting carrier's switch serves a geographic area comparable to that served by the incumbent LEC's tandem switch, the appropriate proxy for the interconnecting carrier's additional costs is the LEC tandem interconnection rate.

11 FCC Rcd at 16042 (¶ 1090) (emphasis added).

Moreover, the FCC concedes that some state

26

commissions have interpreted this portion of the *Local Competition Order* as establishing a two-part test for determining a CLEC's entitlement to the tandem rate. Those commissions have concluded that a CLEC seeking the tandem rate must establish *both* that its switch served a geographic area comparable to the ILEC's tandem switch *and* that its own switch performed functions equivalent to the functions performed by the ILEC's tandem switch. However, the FCC notes that the only *regulation* it actually adopted for purposes of determining when a CLEC is entitled to the tandem rate (after discussing the issue in the *Local Implementation Order*) was Rule 51.711(a)(3), which provides:

> Where the switch of a carrier other than an incumbent LEC serves a geographic area comparable to the area served by the incumbent LEC's tandem switch, the appropriate rate for the carrier other than an incumbent LEC is the incumbent LEC's tandem interconnection rate.

47 C.F.R. § 51.711(a)(3). The FCC correctly emphasizes that that regulation says nothing about requiring the "other carrier" (the CLEC) to also satisfy a functional equivalency test to qualify for compensation at the LEC's tandem interconnection rate.

Nevertheless, SBC insists that the regulation cannot be read in isolation from the *Local Competition Order,* and there is support for that position. In *Verizon Communications Inc. v. FCC*, 535 U.S. 467, 537-38 (2002), the Supreme Court upheld an FCC rule on the basis of a limitation expressed not in the

27

rule itself, but rather in the text of the *Local Competition Order*.[7]   Moreover, SBC contends that the rule's omission of a functional equivalency requirement does not resolve the inquiry because the discussion of functional equivalence in the *Local Competition Order* can not be ignored.

As a general proposition, we agree that SBC's argument that the regulation must be read in conjunction with the *Local Competition Order* has merit.  We cannot accept SBC's position here, however, without ignoring FCC pronouncements before it issued the *Order Under Review* on September 3, 2003.  For example, in the *Intercarrier Compensation NPRM*, released on April 27, 2001, the FCC did note that some states had applied a functional equivalency test to determine the availability of the tandem rate.  *Intercarrier Compensation NPRM*, 16 FCC Rcd at 9646-49 (¶¶ 102-107 & n.173).  However, the FCC then clearly stated in the NPRM that such state interpretations were "inconsistent with our rule."  *Id.* at n.173.  Significantly, the FCC issued the NPRM partly to "seek comment on whether

_____

[7]The *Local Competition Order* at issue here is the First Report and Order.  The FCC has issued subsequent Reports and Orders also referred to as the *Local Competition Order*.  For example, the Second Report and Order can be found at 11 FCC Rcd 19392 (1966) and the Third Report and Order can be found at 15 FCC Rcd 3696 (1999).  Each Report and Order was mentioned by the Supreme Court in *Verizon Communications*; however, the Court's ruling mentioned in the text of this opinion was based on the First Report and Order, which is the *Local Competition Order* involved here.

28

section 51.711(a)(3) should be *amended* to include the 'functional equivalency' concept discussed in the text of the Local Competition Order." *Id.* at 9649 (¶ 107) (emphasis added). Obviously, if the FCC believed that § 51.711(a)(3) contained a functional equivalency requirement when promulgated, no amendment would have been necessary.

Moreover, the *Order Under Review* specifically addressed SBC's contention that the regulation must be read in conjunction with the *Local Competition Order*. The *Order Under Review* reads, in relevant part, as follows:

> SBC also argues that section 51.711(a)(3) of our rules must be interpreted to require both a functional equivalence test and a comparable geographic area test based on the discussion in the *Local Competition Order* addressing this issue. As the [*Attwood Letter*] correctly noted, however, the Commission has previously addressed the import of this language in the [NPRM] and stated that "although there has been some confusion stemming from additional language in the text of the [*Local Competition Order*] regarding functional equivalency, section 51.711(a)(3) is clear in requiring only a geographic area test." We reaffirm this interpretation.

*Order*, at 9, ¶ 21 (footnotes omitted). In a footnote to the second sentence, the FCC further clarified what it was referring to in the *Local Competition Order* when it discussed functional equivalence:

29

In reaffirming the Commission's interpretation of the tandem interconnection rate rule, we find no inconsistency between the discussion in the *Local Competition Order* . . . and the language in the promulgated rule. The *Local Competition Order* does refer to a functional analysis that states should apply, but then imposes a geographic area test as a sufficient condition for receiving the tandem rate. *The comparable geographic area test acts as a special case of the functional analysis, i.e, if the geographic area test is satisfied, then functional similarity is established for purposes of determining the appropriate reciprocal compensation rate.* The Commission thus did not preclude states from finding that new technologies are functionally similar to tandem switches even though they do not serve a geographic area comparable to that served by the incumbent LEC's tandem switch. *See, e.g., Florida PSC Order*, 2002 WL 1576912 ("it is appropriate to consider the functionality of an CLEC's network in situations where it does not serve a geographic area comparable to that served by an ILEC tandem switch.").

*Id.* at 9 n.63 (emphasis added).

Accordingly, the *Order Under Review* clearly explained that the FCC decided that a CLEC's newer technology switch is considered the functional equivalent of an ILEC's tandem switch if the geographic area served by the CLEC's newer

30

switch is comparable to the area served by the ILEC's tandem switch. However, a functional equivalency test is still required when, and only when, the CLEC's newer technology switch does not serve a geographic area comparable to that served by the ILEC's tandem switch. Therefore, reading the *Local Competition Order* in conjunction with the regulation does not produce the result SBC advocates.

We conclude that the *Order Under Review* is thoroughly consistent with the *Local Competiton Order*, the regulation, and the *Intercarrier Compensation NPRM*. The *Order Under Review* did not modify or substantively change the FCC's prior interpretation of the regulation or impose new duties upon regulated parties, and therefore the APA's notice and comment requirements do not apply. The *Order Under Review* is, at most, interpretative. It simply clarified, and explained, an existing rule.[8] *Sprint Corp.*, 315 F.3d at 373.

---

[8]This is not a case like *Caruso v. Blockbuster-Sony Music Entertainment Center*, 193 F.3d 730 (3d Cir. 1999) where an agency's subsequent interpretation of a rule would result in the adoption of an entirely new regulation without the notice and comment required by the APA. In *Caruso*, the agency's initial rule, which addressed the placement of wheelchair locations in facilities like the Blockbuster-Sony Music Center, did not include a requirement that wheelchair users be able to see over standing patrons. A subsequent interpretation of that rule that included such a requirement was relied on by a wheelchair bound plaintiff alleging a violation of the rule. However, we found that because the initial rule did not address the issue of

SBC also contends that the *Order Under Review* repudiated the decision in *U.S. West Communications v. MFS Intelenet, Inc.*, 193 F.3d 1112 (9th Cir. 1999). There, the court cited the *Local Competition Order* at ¶ 1090 in stating that "the Commission found that MFS's switch 'is comparable in geographic scope' to U.S. West's tandem switch and 'performs the function of aggregating the traffic . . ..'" 193 F.3d 1112. SBC relies upon that statement in arguing that the court interpreted FCC rulings as requiring a functional equivalence test as well as a geographic area test. SBC then argues that, since the *Order Under Review* substantively altered the legal landscape in the Ninth Circuit, it constituted a new rule and was therefore subject to the APA's notice and comment requirements.[9]

---

sightlines over standing spectators, the subsequent interpretation of that rule to include such a requirement was really an adoption of a new regulation without notice and comment.

[9]In making this argument, SBC cites *National Mining Ass'n v. Department of Labor*, 292 F.3d 849 (D.C. Cir. 2002). SBC contends that *National Mining* stands for the proposition that where an agency's decision sustains one court's interpretation of a regulation, but reverses another court's interpretation of the same regulation, the agency's decision is a new rule that must meet the APA's notice and comment requirements. However, *National Mining* had nothing to do with the APA's notice and comment requirements. Instead, it addressed the question of the retroactivity of a new agency rule

32

The difficulty with this argument is that the court in *MFS Intelenet* did not hold that functional equivalency was a factor in determining compensation rates. Rather, there, the court was only considering whether "[t]he Commission's classification of MFS's switch as a tandem switch was . . . arbitrary and capricious." 193 F.3d at 1124. In holding that it was not, the court noted that the Commission "properly considered whether MFS's switch performs similar functions and serves a geographic area comparable to U.S. West's tandem switch." *Id*., at 1124 (citing *Local Competition Order* at ¶ 1090.). However, the court was not concerned with reciprocal compensation or calculating the appropriate rate a CLEC can charge for completing an ILEC's customer's calls over the CLEC's network. Accordingly, the court's inquiry into whether MFS's network relied upon tandem switches has nothing to do with whether functional equivalency is an element of the compensation rate at issue here.

Moreover, in a later case, the Court of Appeals for the Ninth Circuit clarified this by adopting the same interpretation of the tandem interconnection rate rule that the FCC approved in the *Order Under Review*. In *U.S. West Communications, Inc.*

that essentially adopts the position taken on an issue by one court of appeals, but rejects the position taken by another court of appeals on the same issue. Nevertheless, we will, for argument's sake, accept SBC's claim that where there has been a substantive change in the law, the test for retroactivity is the same as an inquiry into whether notice and comment are required under the APA. Reply Br. at 12 n.5.

*v. Washington Utilities and Transportation Commission*, 255 F.3d 990 (9th Cir. 2001), the issue was whether AT & T Wireless (the CLEC) was entitled to reciprocal compensation based on U.S. West's (the ILEC) end-office rate or tandem rate. U.S. West argued that AT & T should receive reciprocal compensation at the less expensive end-office rate rather than the higher tandem rate because AT&T's mobile switches "[did] not provide the 'same services'" as U.S. West's tandem switch. *Id.* at 996. "AT & T argue[d] that, according to § 51.711(a)(3) . . . it is entitled to the tandem rate because its [mobile switching centers] serve a geographic area comparable to the area served by U.S. West's tandem switches." *Id.* Relying upon the regulation and the text of the *Local Competition Order*, the court concluded that, pursuant to § 51.711(a)(3), AT & T only needed to establish that it served a comparable geographic area to be entitled to the higher tandem compensation rate. *Id.* at 994-98. The court rejected U.S. West's argument to the contrary. *Id.* at 995-96. Accordingly, we can not agree that the *Order Under Review* substantively altered the legal landscape in the Ninth Circuit.

In its Reply Brief, SBC changes its tactic somewhat. There, it argues that the *Order Under Review* was subject to the notice and comment requirements of the APA because it removed the prior authority state commissions had been given to consider functional equivalence in arbitrating compensation agreements pursuant to the *Local Competition Order*. *See* Reply Br. at 10 to 12. SBC claims that "the FCC has no tenable response to the undisputed fact that numerous state commissions and federal courts interpreted the *Local Competition Order* to authorize an inquiry into functional equivalence." *Id.*, at 10. In

34

its opening brief, the FCC had argued that "to [its] knowledge, no federal court of appeals has embraced the ILECs' argument that paragraph 1090 of the *Local Competition Order* imposes a separate functionality requirement in addition to the comparable geographic area test for a competitive carrier to recover the tandem interconnection rate." Appellee's Br. at 12 n.5. SBC then relies upon *MFS Intelenet* to support its attempt to refute the FCC's claim.

However, as we have already explained, the holding in *MFS Intelenet* does not support SBC's position in this dispute. Moreover, the fact that several state utilities commissions adopted a functional equivalence test in arbitrating compensation agreements can not change the text of the regulation that should have governed those arbitrations. That regulation only allows an inquiry into the equivalence of the ILEC's and CLEC's networks when the competing carriers do not serve comparable geographic areas. The fact that state commissions may have strayed beyond those parameters during the regulatory process does not mean that the FCC had to follow the notice and comment requirements of the APA before clarifying what had already been pronounced in the *Local Competition Order*.

**B. The *Order Under Review Is Not Arbitrary or Capricious.***

---

[10]As recited in the earlier discussion of the standard of review:

35

SBC also argues that even if the *Order Under Review* did not violate the notice and comment requirements of the APA, it is arbitrary and capricious because it ensures that a CLEC will receive the higher tandem interconnection rate for all the local traffic terminated over its networks, whether or not it has incurred the costs related to tandem switches. In SBC's view,

> Under the APA, a reviewing court must uphold an FCC order unless it is found to be "arbitrary, capricious, and abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). This is a "deferential standard" that "presume[s] the validity of agency action." *Southwestern Bell Tel. Co. v. FCC*, 168 F.3d 1344, 1352 (D.C.Cir. 1999). The FCC is due substantial deference in its implementation of the Communications Act, and "even greater deference" when interpreting its own rules and regulations." *Capital Network Sys. v. FCC*, 28 F.3d 201, 206 (D.C.Cir. 1994).

*Global NAPs, Inc. v. FCC*, 247 F.3d 252, 257-58 (D.C.Cir. 2001).

that result is contrary to the language of the 1996 Act and the FCC's own regulations; it is therefore arbitrary and capricious. As explained below, we need not reach the merits of that argument because it is time-barred. However, even if SBC were not foreclosed from raising that argument, we would find that it is without merit.

### (1). The Time-Bar.

In arguing that the *Order Under Review* is arbitrary and capricious in not including functional equivalence in the compensation equation, the SBC is actually attacking the reasonableness of Rule 51.711(a)(3) itself. However, 28 U.S.C. § 2344, provides that judicial review of a final order of the FCC must be filed within 60 days after its entry. Rule 51.711(a)(3) was promulgated and adopted in August 1996. Rather than seeking judicial review within that 60 day period, SBC attacked the substance of the Rule in its application for review of the *Attwood Letter* in June of 2001. However, the period within which it could seek the judicial review of Rule 51.711(a)(3) has long since passed and it cannot be challenged in this petition for review.

Not unexpectedly, SBC contends that its substantive challenge to the Rule is not foreclosed by 28 U.S.C. § 2344. It argues that it had no reason to seek review of the Rule in 1996 because the *Local Competition Order* allowed an inquiry into the functional equivalency of a CLEC's switching technology in determining the compensation rate. SBC contends that it was only after the *Attwood Letter* and the *Order Under Review* affirming that *Letter*, that it had reason to know of the demise

37

of the functional equivalency test. SBC believes, therefore, that it may challenge the substantive validity of the rule in a petition for review outside of the 60-day filing deadline.

SBC cites *RCA Global Communications, Inc. v. FCC*, 758 F.2d 722 (D.C. Cir. 1985) in support of its claim that its petition for review is timely. There, the court wrote:

> Although statutory time limitations on judicial review of agency actions are jurisdictional, self-evidently the calender does not run until the agency has decided a question in a manner that reasonably puts aggrieved parties on notice of the rule's content.

*Id.* at 730. Similarly, in *Northwest Tissue Ctr. v. Shalala*, 1 F.3d 522, 530 n.8 (7th Cir. 1993), the court explained:

> Before any litigant reasonably can be expected to present a petition for review of an agency rule, he first must be put on fair notice that the rule in question is applicable to him. Otherwise the agency could promulgate a confusing regulation and, after expiration of the time for any judicial contest, clarify it to the surprise and prejudice of a party whose opportunity for judicial review meanwhile has been extinguished.

However, we can not accept SBC's position without ignoring the fact that the text of Rule 51.711(a)(3) only required functional equivalency in determining if a CLEC is allowed the

38

tandem rate when the CLEC and ILEC do not serve a comparable geographic area.  Absent that limitation, the rule simply does not contain an additional requirement of functional equivalency.  Accordingly, SBC was on notice about the proper application of the rule when it was initially promulgated. Yet, it sought review long after the 60 day period for doing so had expired. Therefore, SBC's belated attempt to now challenge the reasonableness of the Rule is barred by 28 U.S.C. § 2344.

## (2). SBC's Claim Is Meritless Even If It Is Timely.

We would find SBC's claim that the *Order Under Review* is arbitrary and capricious meritless even if its claim was not time-barred.  SBC maintains that the "tandem interconnection rate" consists of three discrete rate elements for each of three distinct functions – tandem switching, transmission between the tandem switch and the end-office switch, and end-office switching.  SBC cites the *Local Competition Order* to support its contention that, under the 1996 Act, a CLEC is only entitled to the tandem rate to the extent that the CLEC performs the three functions that comprise that rate.  The statute authorizes reciprocal compensation rates that compensate carriers for the "costs associated with the transport and termination . . . of calls that originate on the network facilities of the other carrier."  47 U.S.C. § 2552(d)(2)(A)(I).  It also states that the only compensable costs are those that a carrier actually incurs in performing such "transport and termination." Finally, under the statute, reciprocal compensation rates are to be set "on the basis of a reasonable approximation of the additional costs of terminating such calls."  47 U.S.C. § 252 (d)(2)(A)(ii).  SBC reminds us

39

that the FCC has explained that the statute thus contemplates that reciprocal compensation rates be cost-based, and that they "treat transport and termination as separate functions – each with its own cost." *Local Competition Order*, 11 FCC Rcd at 16106 (¶ 1040).

In SBC's view, however, the tandem rate rule, as interpreted in the *Order Under Review*, is not cost-based. Rather, that interpretation of the tandem rate rule entitles a CLEC to receive the entire tandem rate for all traffic delivered to its switch based only upon a showing that its switch serves a geographic area comparable to that served by the ILEC's switch. In SBC's view, that approach is over-inclusive for a number of reasons.

First, SBC claims that the FCC's staff has held that the geographic area test refers not to the actual area served by the CLEC's switch, but rather to the area that could be served by that switch. SBC's Br. at 27 & n.7 (citing autorities). In SBC's view, that is no test at all because modern switches, i.e., switches used by CLECs, are capable of serving wide geographic areas equivalent to 10 to 15 times the area ILEC tandem switches can cover. SBC argues that we can not uphold the *Order Under Review* because it allows a CLEC to receive the tandem rate for all the traffic it receives solely because it could in theory terminate some of that traffic over a broad area, divorced from any reasonable conception of actual cost.

Second, SBC contends that even if the test is confined to circumstances in which the CLEC actually serves a comparable

geographic area, it still remains over-inclusive because it would nevertheless permit a CLEC to receive the tandem rate on all the local traffic it receives at its switch, even where the traffic is switched only once and where the CLEC need not transmit it to a distant end-office switch. According to SBC, this allows the CLEC to receive the tandem rate on all the traffic it receives, even though it never performs two of the three functions (tandem switching and transmission to the end-office switch) encompassed by the tandem rate.

Moreover, SBC claims that this is no idle-possibility because, prior to the FCC's revision of its rules, several state commissions had ruled that a CLEC could not, consistent with the statute, receive the tandem rate on all of the traffic delivered to its switch when the bulk of that traffic was switched once and delivered to so-called convergent customers – i.e, customers located right next door to the CLEC's switch. SBC cites New York as an example of a state commission realizing that many new CLECs had targeted specific types of customers primarily for the purpose of generating large reciprocal compensation payments from the ILEC and refusing to permit the CLECs to receive the tandem compensation rate in all circumstances.[11] The state commissioner explained that the costs of serving a small number of large, convergent customers will likely be lower than the costs of serving a mass market. The

---

[11]*See* Opinion and Order Concerning Reciprocal Compensation, *Proceeding on Motion of the Commmission to Reexamine Reciprocal Compensation*, Case 99-C-0529, N.Y. PUC LEXIS 398 (N.Y. PSC Aug. 26, 1999).

41

commissioner concluded that compensating CLECs that serve such customers at the tandem rate would overcompensate them and encourage them to target convergent customers not as a sustainable business strategy, but rather as a means of drawing above-cost revenues from ILECs.

SBC contends that the "convergent customer situation" highlights the anomalies inherent in always compensating a CLEC as though it is serving a geographically dispersed customer base through a network architecture similar to the ILEC's when it is in fact using a single switch and no transmission facilities to terminate traffic. However, SBC claims that the *Order Under Review* mandates that result.

SBC also claims the result reached in the *Order Under Review* is not just contrary to the cost-based approach mandated by the statute, but contrary to other FCC regulations as well. As an example, SBC cites to the rule requiring that, "[i]n state proceedings, a state commissioner shall establish rates for the transport and termination of telecommunications traffic that are *structured consistently with the manner that carriers incur those costs*." 47 C.F.R. 51.709(a) (emphasis SBC's). According to SBC, where a CLEC uses only a single switch to terminate traffic to its customers, it does not incur the costs associated with the two levels of switching, much less the costs of transmitting the traffic from one switch to another. Therefore, in SBC's view, paying rates designed to cover such costs is simply a windfall to the CLEC that cannot be justified under the FCC's "cost-causative" approach to reciprocal compensation. *Local Competition Order*, 11 FCC Rcd at 16029 (¶ 1063). We are also told that the windfall violates FCC rules

42

requiring that rates for transport and termination be "structured . . . consistently with the principles in . . . [section] 51.509." 47 C.F.R. § 51.109(a). Rule 51.509 established "rate structure rules" contemplating different and discrete rates for (1) "tandem switching," (2) "local switching," and (3) the use of "shared transmission facilities between tandem switches and end offices." 47 C.F.R. § 51.509. However, according to SBC, the *Order Under Review* allows the CLEC to be compensated for all of these functions in all cases without regard for whether they were all performed, simply because the CLEC serves a geographic area comparable to the area served by the ILEC.

Finally, SBC notes that the FCC's rules generally require symmetrical reciprocal compensation rates. As we explained earlier, the "incumbent LEC's transport and termination prices [serve] as a presumptive proxy for other . . . carrier's additional costs of transport and termination." *Local Competition Order*, 11 FCC Rcd at 16040 (¶ 1085); *see also* 47 C.F.R. § 51.711(a). Yet, SBC claims that the *Order Under Review* is asymmetrical because it allows an ILEC to recover the tandem rate only when the CLEC elects to deliver traffic at the ILEC's tandem switch, and thus only when the ILEC actually performs each of the discrete functions (tandem switching, transmission to the end-office switch, and end-office switching) intended to be recovered in the tandem rate. Yet, CLECs are entitled to recover the entire rate, even when they do not perform those discrete functions.

For all of these reasons, SBC contends that the *Order Under Review* is arbitrary and capricious. We cannot agree.

43

SBC's arguments are based upon its interpretation of "costs" in § 252(d)(2)(A) isolated from the rest of the text. Section 252(d)(2)(A), authorizes reciprocal compensation rates based upon a "*reasonable approximation*" of costs. 47 U.S.C. § 252(d)(2)(A)(ii) (emphasis added). SBC's reading of the rule and regulation ignores the a crucial portion of the text. More importantly, in § 252(d)(2)(B)(ii), Congress specifically prohibited "any rate regulation proceeding to *establish with particularity* additional costs of transporting and terminating calls." *See* 47 U.S.C. § 2552(d)(2)(B)(ii) (emphasis added). It is therefore clear that Congress did not contemplate, and clearly did not require, a calculation of the "actual" costs of transporting and terminating calls. In fact, Congress precluded taking that approach to compensation between carriers.

The issue is therefore whether the FCC's rules governing reciprocal compensation establish rates that recover a "reasonable approximation" of the CLEC's costs. It is a basic principle of statutory construction that "a word is known by the company it keeps," and this rule of construction is "wisely applied where a word is capable of many meanings." *Jarecki v. G.D. Searle & Co.*, 367 U.S. 303, 307 (1961); *see also Deal v. United States*, 508 U.S. 129, 132 (1993) ("the meaning of a word cannot be determined in isolation, but must be drawn from the context in which it is used"); *Sekula v. FDIC*, 39 F.3d 448, 454 (3d Cir. 1994) ("[o]ne must look at the entire provision, rather than seize on one part in isolation").

With these canons as our compass, we note that § 252(d)(2)(A) does not define "costs" as "actual costs." Yet, SBC's submission is precisely that. It is arguing that "costs"

44

means "actual costs," even though proceedings to determine "actual costs" are prohibited by Congress. Congress's use of the term "costs" in the reciprocal compensation context indicates that it intended to avoid reciprocal compensation rates based on actual costs and complex cost studies. 47 U.S.C. § 252(d)(2)(B)(ii). Instead, Congress required that the rates for reciprocal compensation be based upon a "reasonable approximation of the additional costs of terminating" calls that originate on another carrier's network. 47 U.S.C. § 252(d)(2)(A)(I), (ii).

When all is said and done, SBC's understandable desire to see compensation it pays to CLECs be based upon a more precise calculus than the geographic area test can perhaps best be answered by a pronouncement the Supreme Court made in another context in *Verizon Communications Inc. v. FCC*, 535 U.S. 467, 539 (2002). There, in rejecting a claim that the price of leasing a competitor's network must be based on a precise evaluation of various economic factors and costs, the Court said:

> The 1996 Act sought to bring competition to local-exchange markets, in part by requiring incumbent local-exchange carriers to lease elements of their networks at rates that would attract new entrants when it would be more efficient to lease than to build or resell. Whether the FCC picked the best way to set these rates is the stuff of debate for economists and regulators versed in the technology of telecommunications and microeconomic pricing theory. The job of

45

judges is to ask whether the Commission made choices reasonably within the pale of statutory possibility in deciding what and how items must be leased and the way to set rates for leasing them. The FCC's pricing and additional combination rules survive that scrutiny.

The FCC's compensation scheme for reciprocal rates also survives that scrutiny. The *Order Under Review* is thoroughly consistent with the *Local Competition Order* and the Rule 51.711(a)(3), and we will therefore deny SBC's petition for review.[12]

## IV. CONCLUSION

For all of the above reasons, we will deny SBC's petition for review of the FCC's *Order Under Review* dated September 3, 2003.

---

[12]As an aside, and without suggesting anything about the merits of SBC's concerns, we agree with the FCC that SBC should present the argument it is making in this petition for review to the FCC in proceedings under the NPRM. There, the FCC has invited comment on whether to revise § 51.711(a)(3) to include a functional equivalency test.