# United States Court of Appeals

FOR THE DISTRICT OF COLUMBIA CIRCUIT

No. 01–1266                                September Term, 2002

Filed On: April 1, 2003

SPRINT CORPORATION,
PETITIONER

v.

FEDERAL COMMUNICATIONS COMMISSION AND
UNITED STATES OF AMERICA,
RESPONDENTS

AMERICAN PUBLIC COMMUNICATIONS COUNCIL, INC., ET AL.,
INTERVENORS

Consolidated with
01–1521, 01–1522, 02–1041, 02–1042

Before: GINSBURG, *Chief Judge*, and ROGERS and TATEL,
*Circuit Judges*.

# O R D E R

It is **ORDERED**, on the court's own motion, that the
opinion filed on January 21, 2003 be amended as follows:

Page 14 at line 1 should read: "and opportunity for com-
ment, we grant the petitions, vacate the rule, and remand the
case to the Commission. In light . . . "

*Per Curiam*

**FOR THE COURT:**
Mark J. Langer, Clerk

BY: Michael C. McGrail
Deputy Clerk

Notice: This opinion is subject to formal revision before publication in the Federal Reporter or U.S.App.D.C. Reports. Users are requested to notify the Clerk of any formal errors in order that corrections may be made before the bound volumes go to press.

# United States Court of Appeals

FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued December 5, 2002   Decided January 21, 2003

No. 01–1266

SPRINT CORPORATION, ET AL.,
PETITIONERS

v.

FEDERAL COMMUNICATIONS COMMISSION AND
UNITED STATES OF AMERICA,
RESPONDENTS

AMERICAN PUBLIC COMMUNICATIONS COUNCIL, INC., ET AL.,
INTERVENORS

———

Consolidated with
Nos. 01–1521, 01–1522, 02–1041, 02–1042

———

On Petitions for Review of Orders of the
Federal Communications Commission

———

*David P. Murray* argued the cause for petitioners. With him on the briefs were *H. Richard Juhnke*, *John E. Benedict*,

---

Bills of costs must be filed within 14 days after entry of judgment. The court looks with disfavor upon motions to file bills of costs out of time.

*Randy J. Branitsky, Thomas F. O'Neil III, William Single IV, Jodie L. Kelley, Mark C. Rosenblum* and *Daniel Meron. Kurt W. Hague, David L. Lawson* and *Peter D. Keisler* entered appearances.

*Joel Marcus*, Counsel, Federal Communications Commission, argued the cause for respondents. With him on the briefs were *Robert B. Nicholson* and *Robert J. Wiggers*, Attorneys, U.S. Department of Justice, *John A. Rogovin*, Deputy General Counsel, Federal Communications Commission, and *John E. Ingle*, Deputy Associate General Counsel. *Lisa E. Boehley*, Counsel, entered an appearance.

*Albert H. Kramer* argued the cause for intervenors American Public Communications Council, et al. With him on the brief were *Robert F. Aldrich, Michael K. Kellogg, Aaron M. Panner, Roger K. Toppins, Gary L. Phillips, James D. Ellis, Michael E. Glover, Edward Shakin,* and *James G. Harralson. Edward G. Modell* entered an appearance.

Before: GINSBURG, *Chief Judge*, and ROGERS and TATEL, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* ROGERS.

ROGERS, *Circuit Judge*: Sprint Corp., AT&T Corp., and Worldcom, Inc. (collectively, "Sprint"), petition for review of a Federal Communications Commission rule governing the means by which payphone service providers are compensated for certain calls made from their payphones. Sprint contends that the rule was promulgated in violation of the notice and comment requirements of the Administrative Procedure Act ("APA"), 5 U.S.C. § 553(b) (2000), and is also arbitrary and capricious. Because the Commission failed to provide adequate notice and opportunity to comment, we grant the petition and remand the case to the Commission.

## I.

Section 276(b)(1)(A) of the Telecommunications Act of 1996 ("1996 Act") directs the Federal Communications Commission

to "establish a per call compensation plan to ensure that all payphone service providers ["PSPs"] are fairly compensated for each and every completed intrastate and interstate call using their payphone...." 47 U.S.C. § 276 (2000). Two types of calls may be placed from a payphone. The first and most common type is the "coin call," in which the caller inserts a coin directly into the payphone before making the call; the rates for coin calls are set by State commissions. At issue here is the second type of call—"coinless calls"—which a caller places by using a service such as directory assistance, operator service, an access code, or a subscriber 800 number.

The Commission explains in its brief that when a caller places a coinless payphone call, the call is initially received by the local exchange carrier ("LEC") that services the payphone. If the call is local, the LEC completes the call itself; if it is long distance, the LEC routes the call to a long-distance carrier, typically an interexchange carrier ("IXC"). The IXC, such as Sprint, AT&T, and Worldcom, is the first facilities-based carrier to receive the call. If the recipient of the call is a customer of the IXC, the IXC will simply transmit the call to the LEC that serves the customer; the IXC is thereby able, Sprint acknowledges, to "track" completion of the call. If the call recipient is not a customer of the IXC, however, the IXC transfers the call to a "reseller" of the IXC's services. Two types of resellers exist. The first, known as switchless resellers, do not possess their own switching facilities and must rely on an IXC to perform the switching and transmission functions that are required to complete a call. When the IXC transfers the call to a switchless reseller, the IXC handles the call as if it were transferring it to one of its own customers, and the IXC is again able to track the call to completion. By contrast, the second type, switch-based resellers ("SBRs"), possess their own switching capacities; hence, when an IXC routes a call to an SBR, the SBR assumes control of the call, and, Sprint asserts in its brief, the IXC can no longer track the call to completion. As the parties acknowledge, in some instances the SBR transfers the call to another SBR, which in turn routes the call to yet another SBR, and so on.

In 1996, the Commission issued a Notice of Proposed Rulemaking ("NPRM") proposing a method for compensating PSPs for coinless calls. *Notice of Proposed Rulemaking*, 11 F.C.C.R. 6716 (1996). A summary of this NPRM was also published in the Federal Register. 61 Fed. Reg. 31,481. After a period of notice and comment, the Commission determined that "the primary economic beneficiary" should bear the burden of both tracking coinless payphone calls to completion and compensating PSPs for those calls. *Payphone Docket, Report and Order*, 11 F.C.C.R. 20,541, 20,584 ¶ 83 (1996) ("*First Payphone Order*"). The Commission therefore concluded that the IXC, or the "underlying, facilities-based carrier," should, as the primary economic beneficiary, compensate the PSP "in lieu of a non-facilities-based carrier that resells services." *Id.* at 20,586 ¶ 86. The Commission did not define the terms "facilities-based carrier" or "reseller." The Commission determined, in response to petitions for reconsideration or clarification, that SBRs possess the switching capabilities necessary to track payphone calls and accordingly clarified that SBRs are "facilities-based carriers" within the meaning of the initial rule. *Payphone Docket, Order on Reconsideration*, 11 F.C.C.R. 21,233, 21,277 ¶ 92 (1996) ("*First Reconsideration Order*").

As facilities-based carriers, then, SBRs were obligated under the *First Reconsideration Order* to compensate PSPs for all completed coinless payphone calls they handled. *Id.* IXCs, in turn, were required to compensate PSPs only for those calls that the IXCs terminated on their own behalf or on behalf of a switchless reseller, and not for those calls the IXCs transferred to an SBR. *Id.* The Commission's Common Carrier Bureau ("Bureau"), in granting, two years later, a waiver to IXCs that had not complied with the *First Payphone Order* within the required one-year period, further clarified that IXCs must provide requesting PSPs with information about the SBRs to which the IXCs route their calls so that the PSPs could identify precisely which SBRs owed them compensation. *Payphone Docket, Mem. Opinion and Order*, 13 F.C.C.R. 10,893, 10,915–16 ¶ 38 (1998). On review, the court upheld the portions of the Commission's 1996 rules that

are pertinent here. *Illinois Pub. Telecomms. Ass'n v. FCC*, 117 F.3d 555, 566–67 (D.C. Cir. 1997).

Then, in 1999, a coalition of the largest PSPs ("Coalition") submitted to the Commission a petition for clarification of the payphone compensation orders ("Coalition Petition"). The Coalition requested that the Commission "clarify, on a going-forward basis, which interexchange carrier is the party responsible for payment of per-call compensation when a dial-around or subscriber call is made from a payphone." The Coalition explained that "[t]he Commission's effort to assign this obligation" jointly to IXCs and SBRs "has led to disagreements among PSPs and IXCs, and has encouraged some IXCs to shirk their payment responsibilities. This has in turn contributed to a serious shortfall in payments of per-call compensation." The Coalition suggested that "the best way to reduce the shortfall would be to place the obligation for payment of per-call compensation on the entity identified by the Carrier Identification Code ('CIC') used to route the compensable call from the Local Exchange Carrier's network."

In April 1999, the Common Carrier Bureau issued a "Public Notice" seeking "comment on the issues raised in [the Coalition Petition's] request for clarification for payment responsibility of per-call compensation when a dial-around or subscriber call[ ] [is] made from a payphone." *Common Carrier Bureau Seeks Comment on the RBOC/GTE/SNET Payphone Coalition Petition for Clarification*, 14 F.C.C.R. 6476 (1999). The Bureau's Notice summarized the Coalition Petition's general request for clarification and its suggested method of using CICs to identify the entity responsible for compensating the PSP. *Id.* The Notice included filing dates for comments and reply comments, *id.*, but the Bureau did not publish the Notice in the Federal Register or issue a notice of proposed rulemaking. Sprint and others filed comments that focused mainly on the Coalition's proposal to rely on CICs, with little discussion of the general method of requiring both IXCs and SBRs to compensate PSPs for coinless payphone calls. Sprint also registered a procedural objection, in a letter to the Bureau, noting that the Commission could sub-

stantively alter the existing compensation rules only after providing notice and an opportunity for comment.

Two years after the Bureau issued its Notice, however, the Commission largely jettisoned the approach adopted in the *First Reconsideration Order*. In the *Second Order on Reconsideration*, 16 F.C.C.R. 8098 (2001) ("*Second Reconsideration Order*"), the Commission stated that it was "revis[ing]" and "modify[ing]" its "rules to address the difficulty which PSPs face in obtaining compensation for coinless calls placed from payphones which involve a switch-based telecommunications reseller in the call path." *Id.* at 8098 ¶ 1. Declining to adopt the Coalition's proposed method of using CICs to identify the carrier responsible for compensating the PSP, *id.* at 8107 ¶ 22, the Commission instead shifted the burden of tracking all calls to completion and compensating PSPs to the IXCs alone, while permitting the IXCs to recover these costs from the SBRs to which they transferred the calls. *Id.* at 8098 ¶ 2, 8106 ¶ 18. The Commission explained that the IXCs were in the best position to track calls and to make reporting a condition of their contracts for providing services. *Id.* at 8105 ¶ 16. The Commission also broadened IXCs' reporting obligations to require IXCs to inform each PSP of the volume of calls for each access-code and 800 number that the IXC received from that PSP's payphones. *Compare First Payphone Order*, 11 F.C.C.R. at 20,596 ¶ 110, *with Second Reconsideration Order*, 16 F.C.C.R. at 8106 ¶ 18. Finally, the Commission noted that PSPs could continue to arrange alternative compensation schemes through private contracts with IXCs and SBRs. *Second Reconsideration Order*, 16 F.C.C.R. at 8106–07 ¶ 19. The Commission amended its regulations to reflect these changes. *See* 47 C.F.R. §§ 64.1300, 64.1310 (2001). Denying reconsideration, the Commission rejected the IXCs' objections to the new rule. *Third Order on Reconsideration and Order on Clarification*, 16 F.C.C.R. 20,922 (2001). Sprint now petitions the court for review.

## II.

Sprint's contention that the Commission erred by failing to issue a new NPRM prior to promulgating a new rule in the

*Second Order on Reconsideration* is based on the notice requirement of § 553(b) of the APA, which provides in relevant part: "General notice of proposed rule making shall be published in the Federal Register, unless persons subject thereto are named and either personally served or otherwise have actual notice thereof in accordance with law." 5 U.S.C. § 553(b). The court has observed that the notice requirement of the APA does not simply erect arbitrary hoops through which federal agencies must jump without reason. Rather, the notice requirement "improves the quality of agency rulemaking" by exposing regulations " 'to diverse public comment,' " ensures " 'fairness to affected parties,' " and provides a well-developed record that "enhances the quality of judicial review." *Small Refiner Lead Phase–Down Task Force v. United States EPA*, 705 F.2d 506, 547 (D.C. Cir. 1983) (citations omitted). In contrast to an informal adjudication or a mere policy statement, which "lacks the firmness of a [prescribed] standard," an agency's imposition of requirements that "affect subsequent [agency] acts" and have a "future effect" on a party before the agency triggers the APA notice requirement. *Sugar Cane Growers Coop. v. Veneman*, 289 F.3d 89, 95–96 (D.C. Cir. 2002) (internal quotations and citation omitted).

At the same time, agencies possess the authority in some instances to clarify or set aside existing rules without issuing a new NPRM and engaging in a new round of notice and comment. For example, in *City of Stoughton v. United States EPA*, 858 F.2d 747, 751 (D.C. Cir. 1988), the court held that the EPA was not required to engage in a new round of notice and comment where it merely adjusted a score under the Comprehensive Environmental Response, Compensation and Liability Act of 1980, Pub. L. No. 96–510, 94 Stat. 2767, in response to public comments. The authority to clarify or reconsider a rule may arise directly from a statute, as in the Natural Gas Act, *see Tennessee Gas Pipeline Co. v. FERC*, 871 F.2d 1099, 1108 (D.C. Cir. 1989), or pursuant to agency rulemaking authority, as in the case of the Commission, whose procedures authorize it to set aside an existing rule, on

its own motion, within thirty days of promulgating the rule. FCC Practice and Procedure, 47 C.F.R. § 1.108 (2001).

Underlying these general principles is a distinction between rulemaking and a clarification of an existing rule. Whereas a clarification may be embodied in an interpretive rule that is exempt from notice and comment requirements, 5 U.S.C. § 553(b)(3)(A), *see Am. Mining Cong. v. Mine Safety & Health Admin.*, 995 F.2d 1106, 1109 (D.C. Cir. 1993), new rules that work substantive changes in prior regulations are subject to the APA's procedures. Thus, in *National Family Planning & Reproductive Health Ass'n v. Sullivan*, the court described as "a maxim of administrative law" the proposition that, " '[i]f a second rule repudiates or is irreconcilable with [a prior legislative rule], the second rule must be an amendment of the first; and, of course, an amendment to a legislative rule must itself be legislative.' " 979 F.2d 227, 235 (D.C. Cir. 1992) (quoting Michael Asimow, *Nonlegislative Rulemaking and Regulatory Reform*, 1985 Duke L.J. 381, 386); *see also Am. Mining Cong.*, 995 F.2d at 1109. The Commission proceedings at issue illustrate the distinction. In the *First Reconsideration Order*, the Commission clarified its initial rule by providing a definition of the phrase "facilities-based carriers." 11 F.C.C.R. at 21,277 ¶ 92 (1996). Although definitions may vary in a way that would trigger the APA notice requirements, *see Nat'l Family Planning*, 979 F.2d at 235 (citing *Homemakers North Shore, Inc. v. Bowen*, 832 F.2d 408, 412 (7th Cir. 1987)), the Commission's clarification in the *First Reconsideration Order* merely illustrated its original intent. By contrast, when an agency changes the rules of the game—such that one source becomes solely responsible for what had been a dual responsibility and then must assume additional obligations, as occurred in the Commission's *Second Reconsideration Order*—more than a clarification has occurred. To conclude otherwise would intolerably blur the line between when the APA notice requirement is triggered and when it is not.

With these principles in mind, we turn to the Commission's position that the APA notice requirement is inapplicable to its determinations in the *Second Reconsideration Order*. The

Commission concedes that it did not publish a NPRM—or even the Bureau's Notice—in the Federal Register. It also acknowledges that, because the Bureau's Notice did not specifically name Sprint, any "actual notice" that the agency provided to Sprint does not suffice under § 553(b). *See Util. Solid Waste Activities Group v. EPA*, 236 F.3d 749, 754 (D.C. Cir. 2001). Instead, the Commission contends that its determinations in the *Second Reconsideration Order* did not necessitate a new NPRM and that Sprint in fact received adequate notice and opportunity to comment. The Commission offers several alternative theories in support of its position.

First, the Commission maintains that it is permitted *sua sponte* to reconsider its rules where a reconsideration order is pending, so long as the original proposed rule supplied notice. This principle, however, is inapposite in the context of new rulemakings. The Commission points to a regulation that authorizes the Commission, "on its own motion," to "set aside any action made or taken by it within 30 days from the date of public notice of such action...." Practice and Procedure, 47 C.F.R. § 1.108 (2001). This thirty-day deadline, the Commission maintains, may be tolled by pending motions for reconsideration, citing *Central Florida Enterprises v. FCC*, 598 F.2d 37, 48 n.51 (D.C. Cir. 1978). But the Commission's effort to take refuge in its regulation fails. The court in *Central Florida* merely stated that "where ... several petitions are consolidated for hearing and decision, a petition for reconsideration of any of the ensuing orders tolls the thirty day period as to all orders in the case." *Id.* Although *Central Florida*'s holding might assist the Commission were it merely setting aside an existing rule, in the instant case the Commission, more than four years after issuing its original rule, changed the payment and reporting obligations of affected parties. While maintaining that it was merely setting aside a previous action, the Commission itself stated in the *Second Reconsideration Order* that it was "revis[ing]" and "modify[ing]" its rules. 16 F.C.C.R. at 8098 ¶ 1. Moreover, the Commission changed the text of the regulation appearing in the Code of Federal Regulations. This stands in contrast to the *First Reconsideration Order*, when the Commission

simply clarified the definition of a phrase that it had used in the initial rule. 11 F.C.C.R. at 21,277 ¶ 92.

The Commission's reliance on *American Mining Congress v. United States EPA*, 907 F.2d 1179 (D.C. Cir. 1990), is similarly unavailing. In that case, the court held that the agency had complied with the APA's notice requirements where it reinstated a rule that it had withdrawn eight years earlier. 907 F.2d at 1182. Because the petitioners had two opportunities for notice and comment before the agency promulgated the reinstated rule, the court held that "[t]his was more than enough to satisfy the requirements of the APA." *Id.* Here, by contrast, the Commission has not simply reinstated a previously withdrawn rule, much less the rule it promulgated in the *First Payphone Order*. The rule embodied in the *Second Reconsideration Order* differs from the initial rule, which provided that the "underlying, facilities-based carrier," without defining that term, should compensate the PSPs. *First Payphone Order*, 11 F.C.C.R. at 20,586 ¶ 86 (1996). When the Commission later defined the phrase in the *First Reconsideration Order*, it clarified that "facilities-based carriers" include SBRs. 11 F.C.C.R. at 21,277 ¶ 92 (1996). Thus, the initial rule embodied a dual system of payment responsibility involving both the IXCs and the SBRs. Because the *Second Reconsideration Order* departs from that understanding and effects a change in the regulation, it is not identical to the initial rule. It also differs from the initial rule because the *Second Reconsideration Order* increases the IXCs' reporting obligations substantially beyond those contained in the *First Payphone Order*. 16 F.C.C.R. at 8106 ¶ 18; *see also Miscellaneous Rules Relating to Common Carriers*, 47 C.F.R. § 64.1310(a) (2001). Given the changes to the payment-responsibility requirements, the rule promulgated in the *Second Reconsideration Order* is not a reinstatement of the original rule, and consequently nothing in *American Mining Congress* would exempt the Commission's determinations from the APA notice requirement.

Second, the Commission maintains that it was not required to issue a new NPRM because its determination in the *Second Reconsideration Order* was a "logical outgrowth" of

the Bureau's Notice. "[A]n agency may make changes in its proposed rule on the basis of comments without triggering a new round of comments, at least where the changes are a 'logical outgrowth' of the proposal and previous comments." *City of Stoughton*, 858 F.2d at 751. In order for a final rule to be a "logical outgrowth" of a proposal, however, the agency first must have provided proper notice of the proposal. "The necessary predicate . . . is that the agency has alerted interested parties to the possibility of the agency's adopting a rule different than the one proposed." *Kooritsky v. Reich*, 17 F.3d 1509, 1513 (D.C. Cir. 1994). Whereas in *Kooritsky*, *id.* at 1512, and *City of Stoughton*, 858 F.2d at 749, the agencies began their rulemaking processes with NPRMs, here the Commission did not publish a notice in the Federal Register. Instead, it purported to act through the Common Carrier Bureau, which lacks the authority under the Commission's regulations to issue notices of proposed rulemaking. Commission Organization, 47 C.F.R. § 0.291(g) (2001). Sprint, therefore, was not on notice that the Commission was proposing to "revise" its initial rule, much less that it would shift the locus of payment responsibility in any manner other than the Coalition Petition's CIC proposal. We leave open the question whether adoption of the CIC approach also would have necessitated a new NPRM. *See Nat'l Family Planning*, 979 F.2d at 235. Suffice it to say, there can be no "logical outgrowth" of a proposal that the agency has not properly noticed. *See McClouth Steel Prods. Corp. v. Thomas*, 838 F.2d 1317, 1323 (D.C. Cir. 1988).

Third, the Commission maintains that the Coalition Petition and the Bureau's Notice placed Sprint on actual notice of the new rule, and that this actual notice cures any procedural deficiencies in the Commission's promulgation of a new rule. But, as noted, the authority delegated to the Bureau by the Commission to issue public notices does not extend to issuance of NPRMs, 47 C.F.R. § 0.291(g), and Sprint could reasonably assume that the Commission would not undertake, as a result of the Bureau's Notice, consideration of more than the proposal in the Coalition's Petition. Furthermore, the comments submitted in response to the Bureau's Notice demonstrate that the parties did not appreciate that the

Commission was contemplating revision of the dual scheme of payment responsibility. Nor did anything in the Bureau's Notice suggest that the Commission would impose additional reporting requirements on IXCs, and the commenters understandably submitted no comments on this point. *See MCI Telecomms. Corp. v. FCC*, 57 F.3d 1136, 1142–43 (D.C. Cir. 1995). Necessarily, then, the Bureau's Notice did not provide "actual notice" sufficient to remedy the Commission's procedural shortcomings.

In a last gasp, the Commission contends that even if the APA notice requirement applied to the Commission's revision of the initial rule in the *Second Reconsideration Order* and the Commission failed to follow the requirement, the APA incorporates a prejudicial error rule, and Sprint has failed to show prejudice from the Commission's procedural shortcomings. The APA instructs that reviewing courts take "due account . . . of the rule of prejudicial error." 5 U.S.C. § 706. In *Sugar Cane Growers Cooperative v. Veneman*, 289 F.3d 89 (D.C. Cir. 2002), the court noted the standard established in *McLouth*, 838 F.2d at 1324, and explained that "an utter failure to comply with notice and comment cannot be considered harmless if there is any uncertainty at all as to the effect of that failure." *Sugar Cane Growers*, 289 F.3d at 96. The court observed that broadening the harmless error rule would

> virtually repeal section 553's requirements: if the government could skip those procedures, engage in informal consultation, and then be protected from judicial review unless a petitioner could show a new argument—not presented informally—section 553 obviously would be eviscerated. The government could avoid the necessity of publishing a notice of a proposed rule and perhaps, most important, would not be obliged to set forth a statement of the basis and purpose of the rule, which needs to take account of the major comments—and often is a major focus of judicial review.

*Id.* at 96–97.

The same dangers are present here. First, as noted, the Commission's description of its determination in the *Second*

*Reconsideration Order* as a "revis[ion]" and "modif[ication]" of its rules, as well as the Commission's amendment of its regulations, indicates that more than a clarification of the initial rule was involved. This fact alone may have prejudiced Sprint insofar as it is procedurally more difficult to obtain reversal of a new rule than to petition for reconsideration of a clarification. *Cf. Stuart–James Co. v. SEC*, 857 F.2d 796, 801 (D.C. Cir. 1988). Second, although a showing of actual prejudice is not required under the prejudicial error rule, Sprint has made a colorable claim that it would have more thoroughly presented its arguments had it known that the Commission was contemplating a rulemaking. *See Sugar Cane Growers*, 289 F.3d at 97. The *Second Reconsideration Order* assumes, for example, that the IXCs are in a superior position to track calls because they may use their market leverage to impose client reporting requirements as a condition of service. IXCs might have been able to affect this determination (notwithstanding the Commission's view that the technology exists for IXCs to track calls) by presenting additional information demonstrating shortcomings and burdens that the Commission had not adequately considered. Without notice of the Commission's assumption that IXCs alone were in a superior position, however, the IXCs had no opportunity to present their evidence. Third, the Commission provided inadequate notice that it was considering a change in reporting requirements, which under the new rule are more burdensome than in the initial rule. Under the circumstances, the Commission "has offered no persuasive evidence that possible objections to its final rule[ ] have been given sufficient consideration." *Shell Oil v. EPA*, 950 F.2d 741, 752 (D.C. Cir. 1991). Thus, the effect of the Commission's procedural errors is uncertain, and the Commission's "utter failure" to afford proper notice and comment was not harmless. *Sugar Cane Growers*, 289 F.3d at 96.

Although the Commission must have flexibility to adjust a regulatory scheme as concerns and problems arise in an obviously complex and developing area, it must conform its conduct to the APA notice requirement. Because the Commission failed to issue a new NPRM to afford proper notice

and opportunity for comment, we grant the petitions, vacate the rule, and remand the case to the Commission. In light of the remand, we do not reach Sprint's contention that the rule is arbitrary and capricious.